Jones, Chief Judge,
concurring:
I concur in the result.
As a condition to the purchase of the vessels in dispute in this case, the Maritime Commission required of prospective *361 bidders that, after purchase, the ships would be operated under the American flag. In full knowledge of that requirement, the plaintiff purchased four German merchant ships from the Maritime Commission. The price of conforming to American standards was higher than originally anticipated by the plaintiff. As is related in the majority opinion, when the cost of conversion of one of the vessels was added to the sales price, the plaintiff discovered that he had invested $500,000 in a 4,200-ton ship while the Commission was selling 10,400-ton American-built Liberty ships for $544,000.
Even after the high cost of conversion had been borne by the plaintiff, it proved impossible financially to operate the converted vessel. The plaintiff, as a result, desired to sell the vessels to foreign purchasers. Ultimately, the Commission consented. However, it tied a price to its consent. It charged plaintiff $516,308.82 for permitting it to sell to foreign purchasers.
There is no doubt that plaintiff had made a bad bargain with regard to purchase of these vessels. That fact alone of •course gives it no claims on the public treasury. However, in these circumstances, considering the full measure of the plaintiff’s loss, it was unreasonable of the Maritime Commission to exact large amounts from plaintiff before permitting it to escape one of the more onerous provisions of its sales contract, i.e., the requirement that the vessels were to be operated under the American flag.
However, I wish to take exception to the view expressed in the majority opinion that the exaction of a money payment by Maritime can never have relevance in determining whether permission should be granted to sell to foreign purchasers or to transfer to foreign registry. In Suwannee Steamship Co. v. United States, 150 Ct. Cl. 331, the Maritime Commission had requested the payment of $20,000 before it would permit the plaintiff to transfer to foreign registry. The court held that this request was improper. In that case I dissented. In Simannee the plaintiff had pledged to equip itself in American shipyards. Without even doing so, it complained of its bargain to Maritime and asked permission to fly another flag. Maritime resolved to charge it for going elsewhere. Here, on the other hand, the plaintiff, at great *362 expense, sought to equip at least one of its ships to conform to American standards. After doing so, it was demonstrated that none of the ships could be feasibly repaired and operated under American documentation.
No sound administrative policy is served by the exaction of the sum which was required of the plaintiff in this situation. I think it important, however, to restate my conviction that in some circumstances exaction of a money payment by the Maritime Commission may quite properly serve the ends of administrative policy. The statute, the Shipping Act of 1916, 46 TJ.S.C. § 839, gives very generous discretion to Maritime to condition approval in matters of this kind.
I have no doubt that, if the circumstances warrant, payment of a sum of money may be conditioned to Maritime’s approval in a given situation.
EINMNGS OP PACT
The court, having considered the evidence, the report of. Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
I. Plaintipp’s Claim
A. PRELIMINARY
1. This is a claim, for the recovery of $516,308.82 which was collected from plaintiff by the former Maritime Commission and successor agencies (hereinafter sometimes referred to as “Maritime”) as a condition of Maritime’s approval under Sections 9 and 41 of the Shipping Act, 1916, of plaintiff’s transfer of four ships from American to foreign ownership and flag, and for $56,000 damages for delay in approving the transfer.
2. Plaintiff is, and always has been, a corporation organized and existing under the laws of New York; plaintiff’s present address is 80 Broad Street, New York, New York.
B. ACQUISITION OP THE SHIPS
3. During 1947 and 1948, plaintiff became the owner of four merchant vessels, the MV Sea Trader (formerly *363 Empire Helmsdale), SS Empire Blaelewater, SS Dr. Heinrich Wiegand,, and SS Haussa (see below). These four ships were part of a group of 14 former German vessels acquired at the end of World War II by the United States as prizes of war and turned over to Maritime, which olfered them for sale under competitive bidding in January 1947.
4. Plaintiff was the successful bidder for two of the vessels, the /Sea Trader and the Blackwater, for which it bid $223,000 and $216,000, respectively. Having paid these sums in accordance with the terms of the bid, plaintiff acquired title to the vessels from the United States on June 6, 1947.
5. The successful bidder for the third ship, the Dr. Heinrich Wiegand, was Louis M. Marangos, a ship captain associated with plaintiff. Plaintiff and Manuel E. Kulukundis advanced Marangos $91,350, the amount of his bid, and he acquired title to the Wiegand from the United States on June 13, 1947. Thereafter Marangos found himself unable to raise the funds necessary to place the vessel in operation, and plaintiff agreed to take over the vessel in satisfaction of the advance; title was transferred to plaintiff on March 30, 1948.
6. The fourth ship, the Haussa, having been offered for sale and subsequently withdrawn by Maritime two or three times, was finally sold on April 28, 1948. The successful bidder was Philip Carlip, a ship broker; the amount of his bid was $76,100. This bid was made under an arrangement between Carlip and plaintiff, whereby plaintiff was given an option to acquire the Haussa from Carlip, should his bid be successful, for $5,000 in excess of the cost to him. The United States transferred title to the Haussa to Carlip on June 16, 1948. Plaintiff promptly exercised its option to acquire the ship from Carlip. Title was formally transferred from Carlip to plaintiff on August 14,1950.
C. ECONOMIC DIFEICTTLTIES
7. The invitations for bids issued by Maritime had contained a provision requiring that the vessels be documented and operated under the United States flag only. Before United States documentation could be obtained, extensive work was necessary to bring the ships, which were foreign- *364 built, into conformity with the classification requirements of the American Bureau of Shipping and the Steamboat Inspection Service of the Coast Guard. Plaintiff set about doing this work, selecting the Sea Trader as the first vessel to be documented, as she appeared to require the least alteration of the three vessels then owned by plaintiff. Additional fireproofing, a new electrical system, a new C02 system, examination of the machinery, new lifeboats, and changes in the crew’s quarters were required, inter alia. Plaintiff made alterations at a cost of approximately $305,928.98. Thus plaintiff’s total investment exceeded $500,000 in this 4200-ton ship, as compared with a statutory sales price of $544,000 for a 10,400-ton Liberty ship. On October 23,1947, the American Bureau of Shipping certified that the Sea Trader was in class; and on November 7, 1947, a registry document was issued and the ship began operations under the United States flag.
8. Plaintiff operated her in liner service (for which she was especially suited because of her small ratio of deadweight to cubic capacity) under a number of carefully selected successive charters. The rate received by plaintiff was high, in relation to market charter rates; but, despite this, owing to her small size and to plaintiff’s heavy investment in conversion expenses, none of which improved materially the earning capacity of the ship, all of the operations resulted in losses. Plaintiff’s total out-of-pocket operating loss during its ownership of the Sea Trader was about $70,000, before deduction of depreciation and interest charges.
9. Pending the results of the conversion and operation of the Sea Trader, plaintiff laid up the Blaclcwater and the Wiegand. It was apparent that the alteration and conversion cost of obtaining American documentation for these two ships would exceed that for the Sea Trader, and this view was confirmed by bids obtained from the repair yards. The lowest bid exceeded $400,000 on the Blacltwater, a ship of less than 5,000 tons. Plaintiff had originally expected to be able to convert the three ships at a cost of approximately $50,000 a ship. The conversion cost thus being prohibitive, the Blaehwater and Wiegand remained laid up at an additional total expense to plaintiff of approximately $88,967.35.
*365 D. EFFORTS TO TRANSFER THE SHIPS
10. When it became apparent that the ships could not profitably be documented and operated under the American flag, plaintiff was faced with the alternative of sustaining additional capital expenditures and operating losses, or of laying up the ships at an out-of-pocket loss, or of scrapping them at the expense of its investment. To relieve its plight, in November 1947, plaintiff and Marangos filed applications with Maritime for permission to document and operate the Blaekwater and Wiegand under Panamanian flag, which would eliminate the costly requirement of meeting United States classification specifications. Plaintiff had no other source of income than these ships. Although apprised of this situation, Maritime denied this application on January 29, 1948; on April 27, 1948, Maritime denied a request for reconsideration.
11. Plaintiff then sought to sell the ships. No American purchasers appearing, on August 4, 1948, plaintiff entered into a contract with Eederiet Ocean A/S, a Danish corporation, for the sale of the Sea Trader, subject to Maritime’s approval, at a price of $662,500. The contract in part provided:
3. The vessel shall be delivered in a United States port North of ITatteras at Seller’s option with the exception of New York City prior to September 30, 1948.
4. The Buyer having inspected the vessel afloat and having accepted the vessel, the sale becomes absolute subject only to the terms of this agreement. * * *
6. This contract is made subject to the Buyer being granted a currency license and an import license from the Danish government for the purchase of the vessel. The Buyer agrees to immediately duly apply for such licenses. This contract is also subject to the Seller obtaining permission from the United States Maritime Commission for the sale and transfer of the vessel to Danish Eegistry without restriction. Seller agrees to immediately duly apply for such permission. Should permission be refused by the Danish government or by the United States Maritime Commission or should the permission granted by the United States Maritime Commission be conditioned, Buyer shall have the option of *366 cancelling this contract and the escrow deposit shall be returned in full to the Buyer.
Title to the vessel was to be transferred on or before September 30,1948.
12. On August 13, 1948, Seatrade and Eederiet Ocean applied to the Commission upon the Commission’s standard form transfer application for permission to transfer the Sea Trader to Danish registry and for approval of the sale to J. Lauritzen, of Copenhagen, Denmark. The J. Lauritzen interests were the owners of Eederiet Ocean. On October 14,1948, Maritime denied the application, and plaintiff was duly so notified. The time provided in the contract for obtaining Maritime’s approval having expired, and an extension granted by the buyer having also expired, the contract terminated and the buyer’s deposit was refunded.
13. In February 1949, plaintiff, as well as other owners of former German ships similarly situated, sought and obtained a hearing before Maritime to consider measures of relief of their plight. At the hearing plaintiff renewed its request for transfer of the BlacTcwater and Wiegand, to Panamanian registry, plaintiff to retain ownership and to operate the ships. Plaintiff offered, if the transfer should be approved, to buy two Liberty ships for operation under the United States flag, as replacements for the ships transferred foreign.
14. It appearing that approval would not be granted for the transfer to Panamanian flag, plaintiff accepted an offer by Hetland Steamship Company of Denmark to buy the BlacTcwater and Wiegand outright; on February 15, 1949, plaintiff and Hetland entered into contracts, subject to Maritime approval, for the sale of the BlacTcwater and the Wiegand respectively to Hetland. The BlacTcwater contract provided for a purchase price of $475,000 and read in part:
5. Buyer to conduct a superficial inspection of the vessel afloat at the earliest possible opportunity and informing the Seller in writing whether or not the vessel is [illegible]. After the Maritime Commission’s approval of transfer of flag has been granted, the Buyer to conduct the usual inspection of the vessel afloat and in dry-dock. The Buyer however, shall have the option to accept the vessed unrepaired. * * *
*367 9. * * * This sale is subject to the Buyer securing the Danish government import licenses for the vessel and also subject to the Seller obtaining, within ninety (90) days from the date of this contract, permission of the United States Government to transfer the vessel to Danish Registry and flag, Seller agreeing to make such application for transfer and endeavor to obtain same, Buyer agreeing to join in signing application with Seller. Should permission of the United States Government to transfer as above provided be refused, or should Danish import license be refused, the deposit shall be immediately released * * * and this contract shall be null and void.
The ’Wiegand, contract was identical except for the purchase price which was $275,000.
15. Pursuant to these contracts plaintiff applied to Maritime for leave to sell the two ships to the Danish buyer and to transfer them to Danish flag and agreed that if approval were granted it would purchase and operate a Liberty to replace each ex-German ship transferred. At the same time, plaintiff approached Rederiet Ocean about the possibility of renewing the contract for the sale of the Sea Trader. Re-deriet advised plaintiff that it would be interested but would not enter into a contract until plaintiff obtained Maritime’s approval of the transfer. Plaintiff therefore renewed its application for leave to sell the Sea Trader to Rederiet Ocean at the old contract price of $662,500 and to transfer her to Danish registry.
16. Maritime took no action on these applications until June 24, 1949. On June 23, 1949, the Danish buyer of the Blachwater and Wiegand notified plaintiff that time was running out on its allocation of dollar exchange from the Danish government to complete the purchase, and plaintiff so notified Maritime by telegram.
e. maritime’s exactions
17. On June 27, 1949, Maritime notified plaintiff that it had approved the sales of the Wiegand, Blachwater and Sea Trader “upon condition that prior to issuance of formal transfer orders evidencing said approval your company shall (1) pay to the Maritime Commission the sum of Four Hundred Fifty Thousand Dollars ($450,000) provided that in *368 event the amount alleged by your company to have been spent for capital improvements about Three Hundred Thousand Dollars ($300,000) on Empire Helmsdale is not verified and approved by the Commission the amount of any dis-allowances therefrom shall also be paid to the Commission, (2) your company shall purchase from the Commission three Liberty vessels on credit basis on terms satisfactory to the Maritime Commission subject to your company fully meeting the requirements of General Order #60 as amended.” Plaintiff immediately notified the buyers of Maritime’s approval.
18. The world market for ships was undergoing a crisis; their value, including that of plaintiff’s ships, had been falling steadily since April 1949 and continued to fall to the end of 1949. The buyer of the Sea Trader, who was under no contractual obligation to accept the ship, therefore declined to purchase the vessel. When the buyer so advised plaintiff’s ship broker, the broker produced an offer from Lloyd Triestino S.A.N., an Italian corporation, to purchase the Sea Trader for $606,500, a reduction of $56,000 from the former price. The market continued to fall; and, no other interest (except for one $500,000 offer) having been shown in any of the vessels in over two years, plaintiff decided to accept Lloyd Triestino’s offer.
19. On July 8,1949, plaintiff and Lloyd Triestino entered into a contract, subject to Maritime’s approval, for the sale of the Sea Trader to the latter for $606,500. The contract provided in part:
11. This Agreement is subject to the Vendor obtaining permission from the United States Maritime Commission for the sale and transfer of this vessel to Italian registry without restrictions, the Vendor applying immediately for such license. Should such permission by the United States Maritime Commission not be granted within 4 (four) weeks from the date this Agreement is dated [July 8, 1949], or should the permission granted by the United States Maritime Commission be conditioned, Purchaser shall have the option of cancelling this Agreement and the escrow deposit shall be refunded in full to the Purchaser.
An addendum to the contract, dated August 16, 1949, extended the time for obtaining Maritime approval to August *369 31,1949. On July 14,1949, Seatrade executed a third application for approval of the transfer of the Sea Trader, this time to Italian registry, and of the sale to Lloyd Triestino.
20. The Danish buyer of the Blaokwater and Wiegand, upon learning of Maritime’s approval, came to the United States to inspect these ships pursuant to the contract of sale. Their condition had deteriorated while they were laid up. On this ground, perhaps prompted by the fall in the market, the buyer demanded a price reduction, exercising a right established by custom of the trade. At plaintiff’s suggestion, the buyer came to Washington and personally informed Maritime of his position.
21. Faced with a falling market for ships and no other prospective buyers, plaintiff was under severe pressure to grant the adjusted price suggested. Plaintiff’s understanding of its contract with the buyer, in accordance with custom, was that it was bound to grant an adjustment for the defects found upon inspection. And, in view of Maritime’s approval, plaintiff deemed itself bound to consummate the sale, since the contract did not contain an exception for conditional approval. Accordingly, on July 15, 1949, plaintiff and the buyer entered into addenda reducing the contract prices, for the Blaokwater, from $475,000 to $390,000, and, for the Wiegand, from $275,000 to $160,000. Keeitals to the addenda stated that various faults in the vessels’ condition required an estimated expense in excess of $85,000 for the Blaokwater and $100,000 for the Wiegand for repairs and replacements. Maritime was informed of the reduction in the sale prices of the B laokwater and Wiegand.
22. Plaintiff then deposited with Maritime a certified check for $450,000, in satisfaction of one of the conditions imposed by Maritime’s June 27, 1949 approval of the Danish transfers. At the same time, plaintiff wrote to the Commission as follows:
In this connection the Commission is respectfully requested to reconsider the amount of money required to be paid to the Commission in light of the facts set out in our letter of July 26, in order that the company may be in a position to operate its new ships without the handicap of a depleted financial position.
*370 23. Needing the $450,000 demanded by Maritime, and wishing to accommodate the buyer, whose allocation of dollar exchange from the Danish government was about to expire, Seatrade transferred title to the Blachwater and Wiegand to the Danish purchaser and received in return the purchase price. The ships, however, remained in port at New York, pending Maritime’s issuance of formal transfer orders. On August 19, 1949, officials of Maritime called plaintiff’s president and secretary to Washington and placed before them, demanding their signature, a document whereby plaintiff purported to agree, in consideration of Maritime’s approval of the foreign transfers, (1) to buy three Liberty ships at the statutory sales price, depositing with Maritime $408,379.50 as a down payment on the purchase; (2) to permit Maritime to collect the $450,000 check deposited in compliance with Maritime’s requirement; and (3) to deposit a further $50,000 with Maritime to be retained by Maritime to the extent that it should determine that any portion of plaintiff’s investment in the ships should be disallowed as a capital investment. Plaintiff’s officers, bound by the contracts of sale, signed this document. Plaintiff then deposited the $50,000 and the $408,379.50 referred to by the document.
24. On August 22, 1949, the Commission issued formal transfer orders C-6501 and C-6502, approving the amended transfer applications respecting the Sea Trader and the Blachwater and Wiegand, respectively. On August 25, 1949, title to the Sea Trader was transferred to the Italian buyer and on August 30 and 31, 1949, respectively, the Wiegand and Blachwater were granted clearance to sail from New York.
25. Following an audit of plaintiff’s accounts, Maritime disallowed $16,308.82 of plaintiff’s capital expenditures on the Sea Trader, retaining that amount from the $50,000 deposited by plaintiff and returning the balance of that deposit. Maritime retained the $450,000 deposit and the $408,379.50 down-payment upon the required purchase of three Liberty ships. After extensive negotiations, the agreement with respect to the Liberty ships was modified so as to permit plaintiff to purchase two Victory ships instead of three Libertys, and in November 1950, plaintiff and Maritime entered into a formal contract for such purchase.
*371 P. THE “HAUSSA” TRANSFER
26. On October 18,1950, Seatrade entered into a contract, subject to Maritime’s approval, to sell the fourth ship, the Haussa, to Atid Navigation Company, an Israeli corporation. The contract price was $285,000. The contract provided in part:
Article Seven : It is mutually understood and agreed by Buyer and Seller that the sale of the Vessel is subject:
(a) to the Federal Maritime Administration’s approval of the transfer of the Vessel’s registry and flag to Israeli; * * *
Article Nine: It is further mutually agreed by the Seller and Buyer that six weeks time from signing of this Agreement will be allowed to secure the aforesaid approvals of the Federal Maritime Administration and the Import and Export Bank. If both approvals are not. obtained in that time, either party shall Pave the option of cancelling this Agreement if so desired, and the deposit of $1,000 shall be returned to the Buyer.
Also on October 18, 1950, the parties entered into an “addendum” to the contract which read in part:
The Seller and Buyer hereby agree that the time provided in Article Nine of the aforesaid Agreement is extended from six weeks to three months and if either or both approvals are not obtained in that time as extended, the Buyer shall have the option to cancel this Agreement and receive the return of his deposit of $1,000 or to accept the Vessel without such approval.
On a standard form Commission application dated November 28, 1950, Seatrade applied for approval of the transfer of the Haussa to Israeli registry and of the sale to Atid Navigation Company.
27. On November 22, 1950, American Israeli Shipping Company, which was the broker in the sale of the Haussa, wrote to Seatrade that the delay in obtaining Maritime approval of the transfer was creating a serious danger that Export-Import Bank funds earmarked for the purchase of the Haussa might be used up.
28. Upon inquiry by Maritime, the State Department and Navy Department found that the sale and transfer would *372 not be in conflict with the foreign or defense policy of the United States. Thereupon, on January 12, 1951, Maritime telegraphed Seatrade that the sale and transfer of the Haussa had been approved “on condition (1) your company pay to Maritime Administration the sum of $50,000 as consideration for release of Haussa from U.S. flag operation; (2) your company agrees to purchase from Maritime Administration as replacement for Haussa, a warbuilt vessel * * Plaintiff duly made the $50,000 payment and agreed to purchase a war-built vessel, the Clifford E. Ashby. A transfer order dated January 12, 1951, No. MA-151, was then issued. Subsequently, the Haussa was transferred to Atid Navigation Company in accordance with the contract.
II. Affirmative Defenses AND Counterclaims
A. PLAINTIFF’S ACQUISITION AND TRANSFER OF VESSELS
29. The Herman Winter. Plaintiff’s first shipping venture occurred in 1942 when it acquired the vessel Herman Winter for $55,000. She was purchased for her machinery, which was to be used in another ship. She was almost immediately requisitioned by the War Shipping Administration; thereafter plaintiff was inactive until it acquired its ex-German ships at the end of the war.
30. The Ex-German Ships. In June 1946, the United States acquired 14 former German vessels as war reparations. The vessels were delivered to the State Department, which declared them surplus and turned them over to Maritime for disposal under the Surplus Property Act of 1944. Maritime offered a number of them for public sale under competitive bidding by Invitation for Bids No. PD-X-262, dated November 13, 1946. Among the vessels thus offered were the Sea Trader (then Empire Helmsdale), the Empire Blaohwater, and the Dr. Heinrich Wiegand.
31. Restrictions on Use. According to Maritime’s understanding, the vessels had been acquired from the Inter-Allied Reparations Agency “on condition that the sales would be limited to U.S. citizens for operation of the vessels under the United States flag * * Accordingly, on December 27, 1946, Maritime amended Invitation for Bids No. PDX-262 to include the following provision:
*373 (f) The Buyer shall not sell (except for scrapping) and shall not operate or cause or permit to be operated (except for removal from the place of delivery) any of the vessels purchased by it prior to documentation under the American flag.
(g) Successors and Assigns — Assignment. All the covenants, stipulations and agreements herein contained are and shall be binding upon the respective heirs, administrators, executors, successors and assigns, if any, of the Buyer and the Commission. However, the Buyer shall neither sell nor assign any of its rights or obligations hereunder without prior written consent of the Commission.
Maritime’s purpose in adding this provision to the Invitation was stated by it as follows:
Numerous inquiries are being received from prospective bidders under Invitation for Bids PD-X-262 for the sale of the eleven ex-German vessels regarding whether these vessels may be transferred to foreign registry and flag. It has been pointed out that PD-X-262 did not contain any provision that these vessels be operated under U.S. flag. This was done intentionally at the time of preparing this bid for the reason that a bid advertisement could not bind in perpetuity the actions of the Commission relating to transfer of registry. Instead, the position of the Commission was set forth in a press release issued concomitantly with the bid advertisement, which indicated that the vessels were being sold for U.S. flag operation.
It is acknowledged that considerable cost would be required to convert these vessels for U.S. flag operation. These vessels were built in foreign yards where the requirements for crew quarters, sanitary facilities, etc. are not so stringent as on American vessels. In addition most of the vessels are coal fired. These vessels cannot be placed in operation under American flag with American crews without revisions to the quarters and to most machinery plants so extensive in nature that they will preclude obtaining bids representing the world market value of these vessels.
There is an indication, however, that these vessels would be of value to operators engaged in the protected trades who could not afford to bid against operators who would desire to place the vessels under a foreign flag. 3m the interests of furthering the American Merchant Marine it is believed desirable that this question be clarified in a maimer which will reserve the bidding *374 to the American, flag operator but not bind the Commission to any action it may take in the future.
32. The Sea Trader and Blachwater. Maritime received 15 bids in reply to its Invitation. Plaintiff’s bid of $223,000 for the Sea Trader and $216,000 for the Blachwater, dated January 28, 1047, was the highest responsive bid for these two vessels. The next highest responsive bids were $151,000 by Isbrandtsen Company for the Sea Trader and $145,600 by Eastport Steamship Corporation for the Blachwater. Maritime also received two bids for the Sea Trader and one bid for the Blachwater higher than plaintiff’s bid; but, because both of these bids were conditioned upon the Commission’s approval of the operation of the vessels under foreign flag, the Commission rejected them. The Sea Trader and Blachwater were accordingly awarded to plaintiff on March 21, 1947. Bills of sale for the vessels were issued to plaintiff on June 6,1947.
33. The Wiegand. The sole responsive bid for the Dr. Heinrich Wiegand was $91,350 by Louis M. Marangos, a ship captain associated with plaintiff. Maritime received one higher bid, which was conditioned as shown above in finding 32, and for that reason, was rejected. The vessel was accordingly awarded to Marangos. Plaintiff and Manuel E. Kulukundis advanced Marangos $91,350, the amount of his bid, and Maritime delivered a bill of sale for the ship to him on June 13, 1947. Plaintiff’s advance was made on the strength of Marangos’s right to insurance proceeds from the loss of a vessel previously owned by him. When it became apparent that the Wiegand could not be documented and placed in operation without the expenditure of a substantial additional capital investment, plaintiff agreed to take over the vessel in satisfaction of its advance; Marangos transferred the vessel to plaintiff by a bill of sale dated March 30,1948.
34. The restriction upon transfer contained in the addendum to Invitation No. PD-X-262, according to plaintiff’s understanding, meant that the ships could not be transferred to foreign ownership or flag without Maritime’s approval. Plaintiff so understood it. Apparently, so did Maritime: thus in November 1947, some months before Marangos trans *375 ferred title to the "Wiegand. to plaintiff, the applications filed by plaintiff and Marangos with Maritime for approval of the transfer of the Blackwater and the Wiega/nd to Panamanian registry apprised Maritime of plaintiff’s intention to acquire the Wiegand, stating:
The SS Dr. Heinrich Wiegand, a 2,500 ton vessel, was purchased for $91,300 from the Maritime Commission by an associate of this corporation, Mr. Louis Marangos, who is a stockholder of this company. It is our mutual intention to bring this ship into the company at cost.
Maritime never questioned or objected to plaintiff’s proposed action. In a Maritime staff memorandum dated October 5, 1948, recommending that the purchasers of the ex-German ships be permitted to transfer them to Panamanian or Honduran flag, the following suggestion appeared:
If the Commission approves the transfer of these vessels to Panamaian [sic] or Honduran flag, the title remaining with present United States owner, it should be upon the condition that there shall be no change in the ownership (except by sale to another citizen of the United States) or the registry of said vessel without the prior consent of the Maritime Commission.
The Commission rejected the recommendation for approving Panamanian transfers, but gave no indication of disagreement with the staff’s suggestion, and plaintiff’s understanding that sale between citizens of the United States was permissible without the prior consent of Maritime, or documentation under the American flag.
35. The Haussa. On February 19,1948, by Invitation for Bids No. PD-X-438, Maritime offered the Haussa for sale under competitive bidding. The invitation contained the above quoted restriction against selling or operating the ship prior to documentation under United States law. The Haussa was one of the ex-German ships; she had not been included in the original invitation for bids because she had not yet been delivered from European waters. She had twice previously (in April 1947 and September 1947) been offered for sale but withdrawn because Maritime deemed the bids inadequate. The highest responsive bid under Invitation No. PD-X-438 was $76,100, by Philip Carlip. The only other *376 bid was $5,005. The vessel was accordingly awarded to Carlip. Plaintiff had bid $138,000 for the Haussa under one of the earlier withdrawn invitations, subject to transfer to Panamanian flag; but its bid had been rejected. When Car-lip suggested to plaintiff that the Haussa could probably be acquired under PD-X-438 for approximately $75,000, plaintiff, being skeptical, entered into an arrangement with Car-lip, whereby plaintiff was given an option to acquire the Haussa from Carlip, should his bid be successful, for $5,000 in excess of the cost to him. The United States issued a bill of sale for the Haussa to Carlip on June 16,1948. Plaintiff promptly exercised its option. Title to the Haussa was not formally transferred from Carlip to plaintiff until August 14,1950, at which time Carlip executed a bill of sale in favor of plaintiff.
36. The Bamapo. On December 22, 1947, by Invitation for Bids No. PD-X-423, the Commission offered the tanker Ramapo for sale under competitive bidding. The invitation contained the usual restriction upon sale and operation prior to documentation under United States law. The Ramapo was a World War I Navy tanker which had been declared surplus by Maritime. Ten responsive bids were received. The highest was $121,300 by James A. Poll. The next highest was $66,500 by H. A. Stavroudis. The Ramapo was accordingly awarded to Poll on March 12,1948, and title was duly transferred to him. Poll was a director of plaintiff; he had bid on the Ramapo in the expectation of assembling a syndicate to acquire her. When he was unable to do so, plaintiff agreed to take over the vessel and repaired and placed her in operation. Title remained in Poll’s name.
37. The applications for foreign transfer. The facts relating to the applications for foreign transfer of the Blade-water, Wiegand and Sea Trader, set forth in findings 10 through 16, are incorporated here by reference. Plaintiff’s applications to transfer and sell the vessels foreign were made only after a good faith attempt to operate the vessels under the United States flag; the attempt was unsuccessful because of the prohibitive cost of converting the ships for United States documentation and because of the unfavorable operating results of the Sea Trader.
*377 38. The Queenston Heights. On April 22, 1949, while its applications ior foreign transfer were pending, plaintiff acquired the T-2 tanker Queenston Heights from American Eastern Corporation for $1,700,000. This was a purely private transaction not involving Maritime. Plaintiff regarded the purchase of the Queenston Heights as an opportunity to recover some of its losses incurred in documenting, operating, and laying up its ex-German ships, since the Queenston Heights had a profitable bareboat charter to the Standard Oil Company of New Jersey.
39. Transfer of the 8ea Trader, Blaehwater, and Wiegand. On June 27, 1949, Maritime notified plaintiff that it had approved the sales of the Wiegand, Blaehwater and Sea Trader to the Danish purchasers “upon condition that prior to issuance of formal transfer orders evidencing said approval your Company shall (1) pay to the Maritime Commission the sum of Four Hundred Fifty Thousand Dollars (450,000) * * * (2) your Company shall purchase from the Commission three Liberty vessels on credit basis on terms satisfactory to the Maritime Commission subject to your company fully meeting the requirements of General Order #60 as amended.”
40. Needing the $450,000 demanded by Maritime and wishing to accommodate the buyer, whose allocation of dollar exchange from the Danish government was about to expire, plaintiff executed a bill of sale for the Blaehwater and Wiegand to the Danish purchaser, receiving in return the purchase money. This took place on or about July 28, 1949, some three weeks before the issuance of formal transfer orders. Neither the Blaehwater nor the Wiegand was then, or ever had been, documented under the laws, of the United States. Maritime was promptly informed of the transfer; it referred the matter informally to the Department of Justice, but the Attorney General’s representative took no action. On August 12, 1949, Maritime did not authorize Customs in New York to grant clearance for these two ships, thus preventing them from leaving port.
41. On August 19, 1949, plaintiff was required to sign an irrevocable offer to purchase three Liberty ships as replacements for the ex-German ships transferred, depositing *378 $408,379.50, as a down payment on tbe three Liberty ships, as well as to make deposits of $450,000 and $50,000 respectively in connection with Maritime’s exaction. Thereupon Maritime issued formal transfer orders and the ships cleared.
42. The two Victorys. Plaintiff had temporary difficulty in meeting the financial requirements imposed by Maritime’s General Order No. 60 for the purchase of war-built vessels, owing in part to the burden of Maritime’s cash exactions in connection with the transfer of the three ex-German ships. On April 12, 1950, Maritime threatened to forfeit plaintiff’s $408,379.50 deposit. Plaintiff then offered to buy the C-2 vessel SS Rankin rather than three Libertys. Maritime rejected this offer but accepted a subsequent offer by plaintiff to purchase two Victorys instead of the three Libertys, applying the $408,379.50 deposit to the price of the Victorys. On November 2, 1950, plaintiff and Maritime entered into a contract for the purchase of two Victorys at the statutory sales price of $879,157 each — a total cost of $1,758,314. Pursuant to Maritime’s suggestion, plaintiff formed a wholly-owned subsidiary, known as Seatrade Corporation of Delaware, to take title to the two vessels. The subsidiary was duly formed, was made a party to the purchase contract, and in due course took title to two ships, the Newberry Victory and the San Angelo Victory. The statutory sales price of the two Victorys was higher than that of three Libertys; nevertheless, plaintiff’s subsidiary qualified fully under General Order No. 60 for the purchase.
43. The Clifford E. Ashby. On October 18,1950, plaintiff contracted to sell the Haussa to Atid Navigation Company subject to Maritime approval. On November 28,1950, plaintiff filed its formal application for approval of the transfer of the Haussa to Israeli flag and of the sale to Atid Navigation Company. Maritime conditioned its approval of the sale and transfer upon plaintiff’s payment of $50,000 and upon plaintiff’s agreement to purchase a war-built vessel as a replacement. Plaintiff accordingly entered into a contract with Maritime on January 15, 1951, to purchase the Victory ship Clifford E. Ashby from Maritime. The contract provided for the establishment of another wholly-owned subsidiary of plaintiff, which in due course was established and took title to the Ashby.
*379 44. The Tagalam. In early 1951, plaintiff purchased the tanker Tagalam, in a private transaction not involving Maritime.
45. Subsequent United States-flag operations. Plaintiff has remained in the shipping business to the present time. In August 1958, it built the 35,000 ton Atlas for operation under the United States flag. It is now building a 45,000 ton tanker for United States-flag operation.
46. Plaintiff’s intent. American flag vessels are inappropriate for speculative purchase, because of the narrow market for such vessels, owing to their relatively high cost of operation as compared with world operating costs. When plaintiff was acquiring the Sea Trader, Blaehwater, and Wiegand, about 2,500 war-built ships were available for purchase on credit terms (with a 25 percent cash down payment and a 3% percent 20-year mortgage) for operation under foreign flag; plaintiff could have acquired such vessels.
47. Plaintiff did not acquire the ex-German ships for purposes of speculation: it has had a long standing interest in American flag vessels other than the ex-German ships, including the Herman Winter, the Queenston Heights, the Newberry Victory, the San Angelo Victory, the Clifford E. Ashby, the Tagalam, the Atlas and the 45,000 deadweight ton tanker now under construction; American flag vessels were not suitable objects of speculation; and war-built ships were available to plaintiff for foreign-flag operation on liberal credit terms at the time plaintiff was acquiring the ex-German ships for cash.
B. PLAINTIFe’s CITIZENSHIP
48. Stockholders, Directors, and Officers. When plaintiff submitted its bid for the Sea Trader and the Blaehwater, when Marangos, Carlip, and Poll submitted their bids for the Wiegand, Haussa and Bamapo, when these bids were accepted, when Maritime transferred title to the vessels to plaintiff, Carlip, Marangos, and Poll, respectively, when these men transferred title to plaintiff, when plaintiff applied for and was granted approval of the transfer of the four ex-German vessels to foreign ownership and flag, and when plaintiff’s subsidiaries acquired the Newberry Victory, *380 the San Angelo Victory, and the Clifford E. Ashby, plaintiff’s president, Aristides Bistis, and all the members of its board of directors were citizens of the United States. Plaintiff at all times had authorized and outstanding one class of stock consisting of 200 shares of voting common stock, a majority of which was owned by citizens of the United States. There existed no contract or understanding whereby the voting power in the corporation was conferred on an alien; there was no trust conferring beneficial ownership upon an alien; and there was no voting trust, pooling agreement, proxy, or other arrangement whereby voting power was conferred upon an alien. Louis Marangos, Philip Car-lip, and James Poll were at all times citizens of the United States.
49. From 1942 until April 1949, a 34 percent minority interest in the stock of plaintiff was held by Manuel E. Kulu-kundis, who was then a Greek national. His family had been in the shipping business for over a hundred years; he himself had been in the shipping business since 1921, as a member of a group known as Bethymnis & Kulukundis, which had owned many ships before World War II. During World War II, he was the representative of the United Greek Ship Owners Corporation before the War Shipping Administration, in which capacity he operated 17 Liberty ships during the war. In 1946 he represented Greek ship owners in acquiring from Maritime some 100 ships to replace Greek ships lost during the war. Mr. Kulukundis became a citizen of the United States in 1955.
50. Until January 24,1947, four days before plaintiff submitted its bid for the Sea Trader and the Blaehwater, Mr. Kulukundis had been treasurer and a member of the Board of Directors of plaintiff. On that date, on the advice of counsel, he resigned as director, remaining treasurer, in order to eliminate doubt as to whether plaintiff qualified as a citizen of the United States within the meaning of Section 2 of the Shipping Act, 1916.
51. Mr. Kulukundis retained his position as treasurer of, and his 34 percent stock interest in, plaintiff until April 7, 1949. At that time, he conveyed 28 shares, representing a 14 percent interest, to Aristides Bistis and George Mav- *381 roleon, in order to qualify the plaintiff would qualify to charter the Qmmston Heights for operation in coastwise trade. Following his naturalization in 1955, Mr. Kulukundis acquired 10 shares, representing 5 percent, from Mr. Anthony Mavroleon for $3,500, the stated value of the shares; he now owns 25 percent of the stock in the plaintiff.
52. Financing. Plaintiff began business in 1942 with a paid-in capital of $70,000, and purchased the Herman Winter for $55,000, retaining $15,000 for expenses and working capital. In 1947, when plaintiff was preparing to bid on the ex-German ships, Mr. Kulukundis purchased plaintiff’s claim for just compensation for the taking of the Herman Winter for $70,000. Mr. Kulukundis eventually realized $77,000 from the claim, the major portion of which was not paid until 1951.
53. When plaintiff decided to bid on the ex-German ships, it planned to finance the transaction by a loan from the Chase National Bank secured by a mortgage on the ships, and to interest a group of investors including Mr. Thodosius Mitrou, Mr. Bistis, and Mr. George Mavroleon. These men were American citizens and each had the means to invest substantial capital in the venture. However, Chase refused to make a loan on the security of the ships because they were undocumented and did not have charters. When it appeared that documentation would be much more costly than originally anticipated, plaintiff could not induce the prospective investors to advance their capital, and Mr. Kulukundis undertook to finance the purchase of the ex-German ships personally.
54. Mr. Kulukundis advanced plaintiff the $223,000 cash purchase price of the Sea Trader; the $126,000 cash purchase price of the BlacTewater; the $91,350 cash purchase price of the Dr. Heinrich Wiegand, which plaintiff in turn advanced to Marangos; and a portion of the $305,928.98 invested by it in the alteration and conversion of the Sea Trader for documentation under the United States flag.
55. The remaining portion of the latter sum, as well as the revolving fund used in operating the Sea Trader, was advanced by Mar Trade Corporation, which was plaintiff’s operating agent. On March 16,1948, more than a year after *382 plaintiff and Marangos bad bid on the Sea Trader, Black-water and Wiegand, Mr. Kulukundis became a 10 percent stockholder in Mar Trade Corporation. On July 6, 1949, Mr. Kulukundis became a 45 percent stockholder in Mar Trade Corporation.
As of December 31, 1947, Mr. Kulukundis had advanced Seatrade Corporation the net sum of $530,300, which was carried on the books of plaintiff as a loan payable to him on open account. On the same date, Mar Trade Corporation had made net advances to plaintiff of $381,320.74.
56. In 1948, Mr. Kulukundis advanced plaintiff approximately $81,100 for the acquisition of the Harnsa; $126,300, for the purchase price of the Ramapo, and $91,575, for repairs on the Ramapo. In 1948 and early 1949 he paid five notes aggregating $346,807.24, for repairs on the Ramapo. As of December 31,1948, he had advanced a cumulative sum of $960,154.83, which was carried on the books of plaintiff as a loan payable on open account. On the same date Mar Trade’s net advances to plaintiff aggregated $455,423.20.
57. In April 1949, plaintiff purchased the Queenston Heights for $1,700,000. The purchase was financed as follows: two loans from the Chase National Bank, one for $1,300,000 and one for $200,000, aggregating $1,500,000 (the $200,000 loan was a short term loan, because plaintiff intended to repay this amount from the proceeds of the prospective sale of the Sea Trader, Blackwater and Wiegand); a loan of $75,000 from American and Overseas Chartering Corporation, the ship broker; and advances of $125,000 from Mr. Kulukundis. The principal security for the bank loan was the charter hire from a profitable bareboat charter of the ship to Standard Oil Company. Mr. Kulukundis gave his personal guarantee for the $1,500,000 bank loan; he also pledged securities owned by him as collateral for the $200,000 portion of the bank loan and for the American Overseas loan and subordinated plaintiff’s debt to him to the bank loan.
58. When plaintiff needed funds to meet Maritime’s exac-tions as a condition of its approval of the transfers foreign of the Sea Trader, Blackwater, and Wiegand, Mr. Kulukundis advanced plaintiff $50,000 on June 6, 1949, and $150,000 on August 31,1949. Another portion of the exactions was sup *383 plied by a loan from the Chase National Bank to plaintiff for $300,000 on August 12, 1949, for which Mr. Kulukundis pledged securities as collateral, guaranteed the loan, and again agreed to subordinate his claims against plaintiff. In connection with both Chase National Bank loans, Mar Trade Corporation also subordinated its claims against plaintiff. At the end of 1949, Mr. Kulukundis’s advances to plaintiff aggregated $1,498,909.05, which were carried on the books of plaintiff as a loan payable on open account. On the same date, Mar Trade’s advances to plaintiff aggregated $457,461.35.
59. On December 12, 1949, pursuant to a separate agreement between Mr. Kulukundis and one Arthur Caplan under which Mr. Kulukundis had agreed to guarantee the purchase price of certain shares held by Caplan in a corporation known as Tramp Shipping and Oil Transportation Corporation, plaintiff paid Mr. Caplan $15,000, which was the book value of the shares agreed to be purchased, and received in return 1,700 shares of common stock of the par value of $17,000 and 330 shares of preferred stock of the par value of $33,000 of that corporation; the remaining $35,000 of the $50,000 guaranty price was paid by Mr. Kulukundis.
60. In June 1950, pursuant to a guaranty arrangement between Mr. Kulukundis and certain stockholders of a corporation known as Philadelphia Marine Corporation, plaintiff acquired a number of shares of that corporation for $8,000, which was their book value; Mr. Kulukundis paid the sellers $22,000 in accordance with his agreement to guarantee them a price of $30,000. On June 25, 1950, Mr. Kulu-kundis sold shares of Philadelphia Marine Corporation of the par value of $60,000 to plaintiff, giving plaintiff an option to resell the shares to him at any time within one year at par value. The purchase price was credited to Mr. Kulukundis’s account on the books of plaintiff.
61. In order to meet Maritime’s financial requirements for the purchase of the Newberry Vietory and San Angelo Victory, plaintiff borrowed $450,000 from the Chase National Bank in November 1950; Mr. Kulukundis guaranteed the loan. At the end of 1950 Mr. Kulukundis’s advances to *384 plaintiff aggregated $1,545,940.49, which was carried on the books of plaintiff as a loan payable on open account. On the same date Mar Trade’s advances aggregated $405,494.35. At the end of March 1951, Mr. Kulukundis’s advances aggregated $2,115,940.49.
62. Plaintiff had repaid approximately two-thirds of its indebtedness to Mr. Kulukundis by 1956. Mr. Kulukundis never gave any personal guarantees to any of the stockholders of plaintiff and never agreed to purchase or find a purchaser for their shares; all of them held their shares at their own risk.
63. Management. Mr. Kulukundis’s function in the management of plaintiff was to advise with respect to the purchase, sale, and financing of ships. Having acted as a broker with Kethymnis & Kulukundis in London, he handled plaintiff’s negotiations with purchasers, sellers, and brokers. Operations were handled independently by other members of the management: chartering, by Mr. Bistis, and Captain Dritsas; outfitting and crewing the vessels, by Captain Drit-sas and James Poll; vessel repairs, by Captain Dritsas; and marine insurance, by Mr. Guilfoyle. Mr. Bistis was president of plaintiff, and Captain Dritsas was employed by Mar Trade, plaintiff’s agent for the chartering and operation of its vessels. These men never consulted Mr. Kulu-kundis upon matters pertaining to operations.
64. Most of plaintiff’s stockholders had independent stature in the shipping business: Mr. Bistis, who was also president, had been in the steamship business for many years and at the time in question had his own company, the Bistis Shipping Agency, steamship agents and brokers in New York; Walker G. Buckner was a Wall Street broker; Captain Dritsas came to plaintiff from Blidberg-Kothchild Company, well known as ship brokers, steamship owners and agents; Louis Marangos had been a ship captain and a small shipowner; George Mavroleon had worked with the War Shipping Administration in Europe.
65. Mr. Kulukundis had no intent to use plaintiff as a vehicle to acquire vessels which he himself, as an alien, was precluded from acquiring. War-built Liberty ships were *385 available for purchase by aliens on credit terms (25 percent cash and 20-year 3y2 percent mortgage for the balance) in larger numbers than the market could absorb. Mr. Kulu-kundis knew this before plaintiff bid on the ex-German ships, because he had represented Greek shipowners since October 1946 in negotiations with Maritime for the purchase of 100 such Liberty ships. Mr. Kulukundis’s own group had not acquired its full quota of these ships.
66. Administrative construction of statute. On June 16, 1950, Francis B. Goertner, then special legal assistant and later general counsel to the Maritime Administration, prepared an opinion for the acting Administrator, dealing with the following question:
. . . whether a corporation is a citizen within the meaning of Section 2 of the Shipping Act, 1916, as amended, when such corporation meets the specific statutory requirements of the section, but individuals admittedly non-citizens have supplied, the predominant part (in one case in excess of 99%) of the funds supplied or invested in the corporation purchasing the vessel.
Mr. Goertner concluded:
After a review of the applicable law, the history of its administration, the cases and precedents in point, and giving recognition to the facts usually obtaining in respect of corporate organization and control, it is my opinion that the existence of predominant financial interests by non-citizens in a corporation does not by itself as a matter of law preclude or invalidate determination that the above named corporations are citizens within the definitions contained in Section 2 of the Shipping Act, 1916, as amended.
67. Accord and satisfaction. In January 1954, the United States filed a libel of information for forfeiture in the United States District Court for the Southern District of New York, in admiralty, against the Queenston Heights. Paragraph VI of the libel alleged:
Seatrade Corporation, at the time of transfer to it and at all times here material, did not qualify as a citizen corporation within the Shipping Act of 1916, as amended, 46 U.S.C. 802, which provides in pertinent part as follows:
*386 [quoting statute]
in that it was under the control of aliens, including Manuel E. Kulukundis; the so-called citizen directors and citizen officers were merely nominees, fiduciaries and agents for said aliens; its stock was not held by citizens free from trust or fiduciary relationship in favor of said aliens; and said aliens furnished substantially all of its capital, managed its financing and by other means were permitted to exercise control over its internal operations.
This allegation constituted the gravamen of the alleged causes of forfeiture. A similar libel was filed in the United States District Court for the Southern District of California against the Tagalam.
68. On June Y, 1954, plaintiff and the United States entered into an agreement of compromise and settlement, settling the claims involved in the foregoing libels. Paragraph IV of the agreement provided as follows:
Nothing contained in this settlement agreement shall be construed to affect any rights which Seatrade Cor-Soration may have with respect to its claim against the bvemment arising out of the payments made or transactions with the Government in connection with the sale by Seatrade Corporation for foreign flag or registry of the vessels Sea Trader (now Bisano), Empire Black-water (now Krussa), Dr. Heinrich Wiegana (now Else Basse), Haussa (now Daniela Borchard) and Bamapo. Such rights are expressly reserved by Seatrade Corporation and are not waived or released by any provision contained herein. It is agreed and understood, however, that nothing contained herein shall in anywise affect or impair any defenses to said claims or any other rights which the Government may have based upon the acquisition or transfer of these vessels, and that the rights of the parties hereto with respect to the said claims and with respect to the said defenses or other rights shall remain in all respects as if this agreement had not been entered into. The Government, however, shall interpose no defense and/or counterclaim to such excepted claims based upon any claims of the Government settled by this agreement of settlement and concerning which Seatrade Corporation has been released by the Government.
*387 Pursuant to this agreement, the libels were voluntarily dismissed, by consent.
o. representations, truth, materiality, reliance, and INTENT
69. The “Affidavits of Nationality (Corporation)”, which were filed by plaintiff with Maritime from time to time as shown below, were made upon a form sent by Maritime to prospective bidders and applicants for ships with the Invitations for Bids and application forms. The information called for by the form was (1) the identity of all the officers and directors of the bidder, (2) a statement that all of them were citizens of the United States, and (3) the following statement:
*5. That title to-percent of the stock of the Bidder is vested in citizens of the United States free from any trust or fiduciary obligation in favor of any person not a citizen of the United States; that-percent of the voting power in the Bidder is vested in citizens of the United States; that there is no contract, understanding, or arrangement that more than-percent of the voting power of the Bidder may be exercised, directly or indirectly, on behalf of any person who is not a citizen of the United States, and that the control of the Bidder is not conferred upon nor permitted to be exercised by any person who is not a citizen of the United States by any means whatsoever.
In accordance with the view expressed in Mr. Goertner’s memorandum, the form requested no information from the bidder regarding the existence, nature, or amount of its debt obligations to citizens or aliens. The form of Affidavit of Nationality (Corporation) used by Maritime has never called for such information.
70. Plaintiff executed and filed such an affidavit with its bid for the Sea Trader and Blaehwater. It referred to the citizenship of the officers and directors in the following manner:
but One
*4. That all of the officers and directors of the Bidder are citizens of the United States.
*388 Being unable to determine from that statement whether the phrase “but one” referred to an officer, which might not have disqualified the plaintiff as a citizen under Section 2 of the Shipping Act, or to a director, which might have done so, Maritime requested Mr. Kulukundis to come to Washington and explain the situation. Mr. Kulukundis explained to Mr. Braund, head of the Ship Sales Division, that he was the alien officer involved, that he had resigned as director in order to eliminate doubt as to plaintiff’s qualifications, and that he had retained the office of treasurer.
71. The explanation satisfied Maritime; it requested a corrected affidavit, which the plaintiff supplied. Maritime then awarded plaintiff the ships.
72. Mr. Kulukundis, through his negotiations with Maritime on behalf of the Greek shipowners, was at that time well known to the staff of Maritime as a Greek national. Among the members of the Maritime staff to whom he was well known in this connection were Captain Conway, Huntington Morse, Mr. Helmbold, Mr. Rorke, and Miss Holmes; he was also well known to Mr. Fitch, Mr. Metz, and Mr. Pimper, of the legal staff, and Admiral Smith, Commissioner Parkhurst, and, later, Commissioner Mellen, of the Commissioners. A number of these people, particularly Huntington Morse and Mr. Helmbold, were also aware of Mr. Kulukundis’s connection with plaintiff throughout the period 1947-1951, and he had come to Mr. Braund in that connection in January 1947.
73. In connection with their respective bids for the Wie-gand, Haussa, and Ramapo, Marangos, Carlip, and Poll filed Affidavits of Nationality upon the form required by Maritime for individuals. The form called merely for their place of birth and naturalization. Carlip and Poll identified themselves as American citizens by birth, and Marangos, as having been naturalized at New Orleans on December 27, 1920.
74. No affidavits of citizenship were required or filed in connection with the applications for Panamanian registry of the Blachwater and Wiegand, or with those for approval of the sales and transfers Danish, Italian, or Israeli of the *389 Sea Trader and Blachwater, the Wiegand, and the Haussa, respectively. The application to purchase three Liberty ships, which was filed in conjunction with the application for approval of the sale and transfer of the Sea Trader, Blachwater, and Wiegand on May 20, 1949, was accompanied by an Affidavit of Nationality (Corporation) executed by plaintiff in the usual form. Following the renewed application for three Liberty ships which Maritime required it to sign on August 19, 1949, plaintiff executed and filed a new Affidavit of Nationality (Corporation).
75. Luring the negotiations for the purchase of the three Libertys and for the substitution of Yictorys, plaintiff submitted to Maritime its balance sheet as of December 31, 1949. This balance sheet contained the following entry:
OTHER LOANS & ADVANCES PAYABLE
M. E. Kulukundis_ 1498809. 05
Mar-Trade Corp_ 463461.35 $1962270. 40
Subsequently, Maritime approved plaintiff’s application and delivered the two Victorys to plaintiff’s wholly-owned subsidiary.
76. The subsidiary, Seatrade Corporation of Delaware, also filed an Affidavit of Nationality (Corporation), dated November 3, 1950, in the usual form. Its president and all of its directors were citizens of the United States, and its sole stockholder was plaintiff.
77. On January 4,1951, plaintiff, by its attorney, executed and filed an affidavit of citizenship in connection with its application to purchase the Clifford E. Asliby as a replacement for the Haussa.
78. A balance sheet of plaintiff as of December 31, 1948, contained an entry, “Loan — M. E. Kulukundis $545,526.81”. This balance sheet was prepared by a bookkeeper, not an accountant, and was not certified; it was not relied upon by Maritime because a later balance sheet was submitted before the consummation of further sales of ships to plaintiff; and the purpose for which it was submitted to Maritime has not been shown. It was prepared for the purpose of reflecting the state of plaintiff’s finances with respect to the three ex-German ships, Sea Trader, Blachwater, and Wiegand, which *390 plaintiff was then seeking to transfer foreign, as a distinct entity from tbe remainder of plaintiff’s finances. The assets and liabilities attributable to those three ships alone were set forth in the balance sheet. As a result, offsetting entries representing the assets and liabilities, including Mr. Ku-lukundis’s advances, attributable to the company’s other interests, were omitted from the balance sheets.
79. Plaintiff at all times believed itself to be a citizen of the United States, and it also believed that neither the law nor the instructions contained in the various invitations to bid respecting the documentation of the vessels, prevented transfers between citizens of the United States. Its opinion was confirmed by Maritime’s silence when advised of plaintiff’s intention to acquire the Wiegand from Marangos, and by Maritime’s approval of the foreign transfer of the Wiegand on plaintiff’s application.
80. When plaintiff bid on the ex-German vessels it had no contact with the persons who later purchased the ships, or with any other potential purchasers; it did not contemplate transferring the vessels foreign, but on the contrary planned to operate them; it first contemplated transferring the vessels to foreign flag in late 1947, after it had discovered the prohibitive cost of documenting the Sea Trader and the unfavorable results of her operation. Its first contact with the purchasers came from recognized ship brokers, through normal channels of the trade.
conclusion oe law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover. It is therefore adjudged and ordered that the plaintiff recover of and from the United States five hundred sixteen thousand three hundred eight dollars and eighty-two cents ($516,308.82). It is further concluded that the defendant is not entitled to recover on its counterclaims and they are dismissed.